Thomas D. Benson, Commissioner of the
Department of Revenue, State of
Tennessee, Plaintiff-in-Error,

*v.*

United States Steel Corporation,
Defendant-in-Error.

465 S.W.2d 124

(*Nashville*, December Term, 1970.)

Opinion filed March 1, 1971.

DAVID M. PACK, Attorney General, PAUL E. JENNINGS, Assistant Attorney General, Nashville, for plaintiff in error.

TYREE B. HARRIS, IV, HOOKER, KEEBLE, DODSON & HARRIS, Nashville, for defendant in error.

MR. JUSTICE CRESON delivered the opinion of the Court.

This cause comes before the Court for review of a judgment of the Circuit Court of Davidson County.

In the course of this opinion, the parties will be referred to as they appeared in the court below; that is, United States Steel Corporation, plaintiff, and Thomas D. Benson, Commissioner of Revenue, defendant.

United States Steel is a foreign corporation, domesticated under the laws of Tennessee. The defendant, Thomas D. Benson, is the Commissioner of Revenue, and is a litigant in this suit in his official capacity only.

The controversy revolves around the meaning and application of T.C.A. sec. 67-3004—Application of property by contractor—, T.C.A. sec. 67-3026—Interest and pen-

alties for delinquency—, and T.C.A. sec. 67-101(12)— Powers of Commissioner of Revenue.

The facts as they appear from the record are that plaintiff is engaged in the manufacture, distribution, erection and use of steel and steel products, and particularly, in this case, fabricated steel for use in bridges constructed by its American Bridge Division. Prior to March, 1957, plaintiff reported and paid its sales and use tax owed to Tennessee based upon the fair market value of its steel when used, pursuant to T.C.A. sec. 67-3004. That statute then read, in part:

> "*Application of property by contractor.*—Where a manufacturer, producer, compounder or contractor erects or applies tangible personal property, which he has manufactured, produced, compounded or severed from the earth, for the account of or under contract with the owner of realty or other property, such person so using the tangible personal property shall pay the tax herein levied on the fair market value of such tangible personal property when used, without any deductions whatsoever."

In March, 1957, the Legislature amended that statute to read in part as follows:

> "provided, however, the foregoing shall not be construed to apply to contractors or subcontractors who fabricate, erect or apply tangible personal property which becomes a component part of a building, and which is not sold by them as a manufactured item."

Upon passage of that amendment plaintiff changed its tax basis, from the fair market value of fabricated steel when used, to the cost price of the materials purchased

or acquired by plaintiff and used in fabricating the steel used in Tennessee.

Plaintiff's tax representative explained that after careful study and analysis, the tax department of United States Steel concluded that the amendment applied to it because United States Steel sold fabricated steel only by design and specification, and never "shelved" or stockpiled it and sold it as a "manufactured item." Testimony of the State showed that the cost to United States Steel of raw materials to manufacture steel is $9.88 per ton, as compared with $120.00 per ton of steel at final fabrication.

Approximately one year later, in April, 1958, the American Bridge Division of United States Steel was audited by the Department of Revenue for the period from January 1, 1953 through February 2, 1958. At this point, there appear confusion and conflict in the testimony as to what was said to plaintiff's tax representative conducting the audit on behalf of the corporation. Plaintiff claims that the three auditors from Tennessee were advised fully of its change in tax basis; that Mr. Roy W. Webb, the auditor in charge, was noncommittal and advised plaintiff that he would report its change to his supervisor in Nashville; and if the new basis was wrong, plaintiff would hear from the Revenue Department. To buttress its claim, plaintiff introduced into evidence a memo dated 4/25/58, and written by Mr. R. G. Gourley, plaintiff's tax representative at the audit, two days after the audit was completed. It stated, in effect, what transpired during the audit; that the State auditors were made aware of plaintiff's change in tax basis; but that plaintiff would hear from the Commissioner in Nashville if the change met with disapproval.

The testimony of Mr. Roy Webb for the Revenue Department is uncertain and confused although, in essence, contrary to that of the plaintiff. Mr. Webb admitted that he could not recall in detail his conversation with Mr. R. G. Gourley, nor all that transpired while he was there. He did testify that he and two other auditors were in Pittsburgh, Pa., in April, 1958, auditing the sales division of American Bridge; that while there, he was informed by plaintiff that it had changed its tax basis on fabricated steel pursuant to amended T.C.A. sec. 67-3004; that he informed plaintiff's tax representatives then that the changed basis was wrong, and the tax basis was "* * * on the fabricating labor on any of the products that they used in building the bridges." Mr. Webb further testified that he did not recall advising Mr. Gourley specifically that he would hear from Nashville, but did recall that upon arriving in Nashville, he reported to Mr. Kenneth Herrell and advised him that the department should make an audit of the contracting division of American Bridge because "* * * I felt like if they didn't change their method of keeping tax that they would owe us a sizeable amount of tax." Finally, under thorough cross-examination by plaintiff's counsel, Mr. Webb admitted that the memo he wrote on January 17, 1967, to Mr. Kenneth Herrell, recalling the audit of American Bridge in Pittsburgh, Pa., in April, 1958, was lacking in many respects because his recollection of what actually transpired was vague; and that the construction contract books of American Bridge were not examined even though he knew that it had changed its method of computing the use tax owed to Tennessee on construction contracts.

Testimony by Mr. R. G. Gourley, plaintiff's only witness, disputed Mr. Webb's testimony with regard to the

audit in April, 1958, at almost every point. With regard to American Bridge's construction contract books, Mr. Gourley testified:

"CROSS EXAMINATION

BY MR. RICE:

Q. Mr. Gourley, were you requested to furnish any records relating to American Bridge contracting operations?

A. Yes, sir.

Q. What was the purpose of the request, what was your understanding of the purpose?

A. For the auditors to audit our construction cost and basis we were using in reporting use tax to the State of Tennessee.

Q. Was any liability—

A. Yes, sir.

Q. —discovered on either of these dates?

A. Yes, sir. No additional liability, I mean, there was reported liability but no additional assessed liability on the audit report due to construction activities.

Q. You think you understand the difference under the State tax law in sales by a corporation and contracts entered into by a corporation?

A. Yes, sir.

Q. And they specifically asked you for records concerning contracts by American Bridge Company?

A. Yes, sir, construction contracts.

Q. As distinguished from sales?

A. As distinguished from sales.

Q. And they found only approximately one hundred dollars additional liability by you on two questionable transactions?

A. Initially there were more than two questionable transactions but later the exemption certificates were furnished by the vendors and so forth. In the final analysis I think it resulted in two transactions, sales transactions being taxable.

Q. Did you consider that they saw all the records they would need to make a complete audit of American Bridge Company during the time they were there?

A. Yes, sir.

Q. Do you think such an audit could be made in two or three days?

A. Yes, sir.

Q. You disagree with Mr. Webb's statement that it would take about four weeks to do that?

A. I make this statement on the basis of my experience in conducting audits with other States.

Q. Would there not have to be some cost analysis type audit made to determine if the liability that American Bridge Company might have just on account of the use of the raw material tax basis reported under Tennessee Use Tax?

A. Yes, and those cost records were made available and we scrutinized them closely and went over them line for line.

\* \* \* \* \* \*

Q. You would then contradict Mr. Webb when he says such an audit would take three to four weeks?

A. I would, yes, sir.''

Nevertheless, the proof shows that plaintiff heard nothing more from the Department of Revenue, and continued to make its returns and pay its tax computed on the cost of the raw materials to manufacture steel beams used in construction of bridges. In July, 1965, during a conference in Nashville, plaintiff was informed that an audit was going to be conducted on the construction contracts of its American Bridge Division. In late 1966, such an audit was conducted for the period from November 1, 1960, through September 30, 1966, and plaintiff was assessed a tax deficiency of $196,811.24; including $33,-567.45 penalty.

On December 19, 1966, plaintiff paid the assessment in full, acquiescing in the Revenue Department's interpretation of the 1957 amendment to T.C.A. sec. 67-3004, as *excluding* plaintiff corporation from the effect of the amendment. The $33,567.45 penalty was paid under protest, however, and plaintiff immediately filed a petition, pursuant to T.C.A. sec. 67-101(12), with the Commissioner of Revenue for a waiver of penalty. In addition, to avoid the statute of limitations, plaintiff filed an action in Circuit Court, pursuant to T.C.A. sec. 67-2301 et seq., seeking recovery only of the sum collected as penalty.

In early January, 1967, prior to trial, the Commissioner of Revenue, under the supervision of Mr. Kenneth Herrell, wrote a Memorandum of Finding of Facts, and filed a copy with the Attorney General, pursuant to T.C.A. sec. 67-101(12). Said Memorandum stated the substance of plaintiff's claim for waiver of penalty, and concluded that $17,948.47 of the aforementioned penalty should be waived and refunded to plaintiff corporation on the ground it reflected that portion of the tax that was assessed on

"* * * special fabrication and transportation charges applicable to personal property when the articles were applied to structures, other than buildings.";

and that $14,572.87 of the aforementioned penalty should not be waived because it reflected that portion of the tax that was assessed on the fair market value of fabricated "* * * standard items of tangible, personal property usually and normally sold by United States Steel Corporation." The Memorandum showed further that the remaining portion of the penalty, some $1,046.11, reflected the tax assessed on equipment imported into Tennessee and used by plaintiff in Tennessee.

The record reveals that plaintiff did not contest the $1,046.11 of the penalty, but sought only to recover the $14,572.87 disallowed by the Commissioner.

Further, proof by the plaintiff showed that the Attorney General's Office did not concur initially with the Commissioner's memorandum; that during a conference in September, 1967, with the Attorney General, plaintiff's tax representative explained what had transpired between plaintiff and defendant, what plaintiff's understanding of its tax basis should be; and that at some

later date, the Attorney General concurred; and plaintiff received a check for the sum of $17,948.47.

In the court below, Judge James Swiggart, writing a memorandum opinion, ordered the Commissioner to refund to United States Steel the remaining $14,572.87, plus $2,513.83 interest; a total of $17,086.69 (sic).

Judge Swiggart was of opinion that although the discretionary power of the Commissioner under T.C.A. sec. 67-101(12) was not subject to judicial review, suit could still be brought against the Commissioner pursuant to T.C.A. sec. 67-2301, et seq., because the refund for penalties illegally assessed became a matter of right rather than discretion. Judge Swiggart then limited his decision to whether plaintiff was legally entitled to a refund of the penalty and found that it was, on two grounds:

First, that T.C.A. sec. 67-3026, which authorized assessment of penalties, was ambiguous in that it could be interpreted "* * * as imposing one or two conditions upon the imposition of penalty."; that under the rule stated in *Tennessee Products and Chemical Corp. v. Dickinson* (1953), 195 Tenn. 63, 256 S.W.2d 709, T.C.A. sec. 67-3026 must be construed "liberally in favor of the taxpayer"; and therefore, if the taxpayer either makes a return or pays the tax, though not the proper amount of tax, there can be no penalty, in absence of fraud.

Second, that the case of *East Tennessee Brewing Co. v. Currier* (1912), 126 Tenn. 535, 150 S.W. 541, established the long standing rule in Tennessee that the courts have authority to refuse enforcement of a penalty where the taxpayer was honestly mistaken as to the amount of tax owed, or that the taxpayer was sin-

cerely doubtful of the validity of the tax. Judge Swiggart stated that, although this suit is brought in Circuit Court, the court has concurrent jurisdiction with Chancery to consider tax refunds on equitable principles in cases brought pursuant to T.C.A. sec. 67-2303; and that in the case at bar, where the only dispute is the method of valuation, there can be no penalty assessed without first a demand from the State.

"Penalties are for the evasive, careless, negligent or recalcitrant taxpayer, not for those who act in good faith by filing returns covering the transaction in question."

The Commissioner of Revenue has perfected an appeal to this Court, and has assigned three errors. They are:

"1. The lower court erred in ordering a refund of penalties imposed by Legislature through statutory directives for the reason that it had no jurisdiction to entertain such suit.

2. The lower court erred in holding that the penalties herein were illegally assessed and in holding that T.C.A. Section 67-3026 was ambiguous in its requirement that a return be filed and the tax be paid.

3. Even if the lower court has jurisdiction to grant the relief prayed, it erred in its determination that 'equity principles' were applicable in the instant case."

By the first assignment of error the defendant contests the jurisdiction of the courts of Tennessee to remit the penalty here involved. For this insistence, the cases of

*Swartz v. Atkins* (1958) 204 Tenn. 23, 315 S.W.2d 393; *Combustion Engineering Co. v. McFarland* (1961) 209 Tenn. 75, 349 S.W.2d 138; and *General Electric Co. v. Butler* (1962) 211 Tenn. 196, 364 S.W. 2d 361, are relied upon. The argument is "that the door is closed on further litigation in the area of sales tax penalties so far as the sales tax statute itself, or the equitable powers of the court, might be regarded as offering an avenue of relief."

Anyone advising the Commissioner of Revenue or the Legislature in this connection, or the Judge designated to write an opinion of this Court on the subject, would be remiss, indeed, if the opinion in *East Tennessee Brewing Co. v. Currier* (1912) 126 Tenn. 535 150 S.W. 541 was not revisited. There, then Mr. Justice Grafton Green, later the revered Chief Justice of this Court for decades, with characteristic industry, discrimination, eloquence and a profound knowledge of the principles involved, splendidly delineated the privilege taxing power of the State, limitations upon the taxpayer's right of challenge, and the traditional jurisdiction of the judiciary of Tennessee to remit illegal or inequitable penalties. The principles there stated, or restated, are as valuable and virile today as they were then.

This brings us to consideration of just what is the true rationale of the cases so emphatically relied upon by defendant Commissioner. The brief on behalf of Commissioner appears to take great comfort from the opinion in *General Electric Co. v. Butler,* supra, as stating the proposition that a mistaken interpretation of the law relating to sales and use tax on the part of the taxpayer is not sufficient to authorize remittance of penalty. Close examination of that opinion reveals that the substance of the case was certain sales made by General Electric to

vendees possessing resale certificates. However, on examination of the record, the Court found that even though said vendees possessed resale certificates, General Electric knew, or should have known, that its products were, in fact, being purchased for ultimate use; this, because of the obvious nature of the vendee's business. Citing the prior opinion in *Swartz v. Atkins,* supra, the holding of the Court is that equity was not properly invoked for the reason that General Electric should have avoided the prejudicial situation in which it later found itself. The gravamen of what was said there is that equity could not rightly be invoked to remit the interest and penalty sued for because General Electric should have known that its merchandise was, in fact, being purchased for ultimate consumption—that is, that the taxpayer's dilemma was referrable to nothing other than its own negligence of omission.

In *Combustion Engineering Co. v. McFarland,* supra, the case was heard on stipulated facts. Consideration of this opinion reflects "that in each instance the failure to report certain items was due to errors, oversights, improper coding of machines * * * of its various record keepers and accountants, whose duty it was to attend to this phase of the business." Further, the Court laid much stress on the fact that the stipulation did not show that the failure to make timely tax returns on these several items was due to the taxpayer being misled.

In the case of *Swartz v. Atkins,* the Court was confronted with the situation that penalties were based upon the taxpayer's failure, for some four or five years, to pay the base use tax on various machines which were placed on locations in restaurants and other public places for the purpose of testing, demonstrating and advertising

them, which machines were at all time for sale. The reason advanced by the taxpayer, though stated variously, in its essence is that he was unaware of the fact that such taxes were owed. This resolves itself to nothing more than a taxpayer's reliance upon his isolated personal ignorance of the import of the sales and use tax law, not inspired in anywise by the Tax Department's action or inaction.

It can fairly be said that, in the instant case, the taxpayer's primary reliance is upon this Court's former opinion in *Tennessee Products and Chemical Corp. v. Dickinson* (1953) 195 Tenn. 63, 256 S.W. 2d 709. This prior opinion is relied upon by the taxpayer for the fundamental proposition that where the equities of the case demand, the courts will exercise their power to remit penalties imposed under the sales and use tax act. In that case, the Court relieved the taxpayer of penalties imposed under the Sales and Use Tax Act for the reason that the equities of the case so demanded. The opinion makes it clear that at the time of the accrual of the penalties involved, the Sales and Use Tax Act was complex, provocative of much uncertainty, *and new*. The case was heard on bill and answer.

While the defendant in the instant case seems to hold the decision in *Tennessee Products and Chemical Corp. v. Dickinson,* supra, up to some scorn, we cannot agree. It is, however, correct to say that later decisions, herein cited, have distinguished that case in the process of concluding in each of these later cases that complainants therein had not made out a case for equitable relief. We must concede, also, that the later decisions have, to a degree, limited application of some of the broad language of that case, particularly that which places emphasis on

(1) the complexity of the statute *when new;* and (2) that a misunderstanding of the extent of liability on the part of the taxpayer, standing alone, would justify granting equitable relief against penalties. However, it simply cannot be said that this Court has overruled that case; and, indeed, it must be said that none of the subsequent cases have impugned the basic principle of the *Tennessee Products* case—that where the equities demand, the Courts will exercise their power to remit penalties.

■ In support of its third assignment of error, defendant cites T.C.A. sec. 67-101 (12), arguing that when the Legislature amended that Section in 1965, the Commissioner of Revenue was given discretionary authority to waive statutory penalties. The argument continues, however, to the conclusion that the Legislature thus manifested an intent to make waiver of tax penalties exclusively an administrative matter within the discretion of the Commissioner. It seems to us, and we hold, that the above constitutes no more than an alternative to the traditional right of the taxpayer to invoke the jurisdiction of equity to *void* those penalties justifiably found to be illegal or inequitable. That is to say, that the statute just alluded to, and the amendment thereof, authorize the Commissioner, in proper cases, to *avoid* some of the voluminous litigation which this rather complex tax statute has provoked.

It is worthy of note that following the 1965 amendment to T.C.A. sec. 67-101, the Attorney General's Office, upon request, produced "guidelines" to be used by the Commissioner in determining what cases present a good and reasonable cause for penalty relief. Those guidelines are as follows:

"(1) The taxpayer incurred the deficiency as a result of having been misled by erroneous advice upon the part of officials charged with the enforcement of the statute.

(2) The taxpayer incurred the deficiency as a result of legal misadvice from an ostensibly competent independent source (lawyer, accountant, etc.).

(3) The provisions of the pertinent law or regulations were at the time the deficiency was incurred unsettled, unclear or misleading to a reasonable person and the taxpayer acted in good faith upon a reasonable though mistaken application of such law or regulations, with the result that the tax deficiency in question was incurred.

(4) The deficiency resulted from reliance by the taxpayer upon factual misrepresentations made by persons with whom he dealt in the course of his business, the taxpayer having no reason to doubt or question such misrepresentations."

While we wish to make it entirely clear that this Court does not at all mean to imply any ulterior motives, this record does support the insistence of plaintiff as to its being misled by the course of events at the time of and following the original discussion between the auditors of plaintiff and those of defendant.

■ With regard to defendant's second assignment of error, we must point out that the lower court did not hold that the penalties were "illegally assessed". That court held, rather, that the penalties were not "properly assessed under the statute". The defendant argues against the conclusion of the court below that T.C.A. sec. 67-3026

was ambiguous, as a basis for the conclusion there reached. We do not deem this to need discussion. If the trial court reached the correct result, the judgment below is entitled to affirmance, irrespective of the reason stated.

In conclusion, the Court is of opinion that the foregoing clearly brings this case within the rationale of *Tennessee Products and Chemical Corp. v. Dickinson,* supra, and the principle there stated and reiterated in subsequent cases; that is, that where the equities of the case demand, the Court will exercise its power to remit tax penalties.

It follows, therefore, that defendant's assignments of error are overruled for the reasons above stated; and the judgment of the lower court affirmed, without costs to plaintiff.

DYER, CHIEF JUSTICE, and CHATTIN, JUSTICE, concur.

HUMPHREYS and McCANLESS, JUSTICES, not participating.