**CITIES SERVICE COMPANY,**
Appellant-Appellee,

v.

**George M. TIDWELL, Commissioner of Revenue, State of Tennessee,**
Appellee-Appellant.

Supreme Court of Tennessee.

Feb. 23, 1976.

J. W. Mills, Frantz, McConnell & Seymour, Knoxville, James C. Gooch and T. G. Pappas, Bass, Berry & Sims, Nashville, for appellant-appellee.

R. A. Ashley, Jr., Atty. Gen., Everett H. Falk, Asst. Atty. Gen., Nashville, for appellee-appellant.

## OPINION

FONES, Chief Justice.

Cities Service Company, as plaintiff, sued the Commissioner of Revenue to recover sales taxes, penalty and interest, paid under protest, levied upon engineering, design, procurement and administrative services rendered by Parsons-Jurden Corporation incident to the purchase of industrial machinery from others. Recovery was also sought of penalties assessed upon sales and use taxes, the validity of which is admitted, but, it is said, the equities demand remission of the penalties.

The Chancellor held that the services of Parsons-Jurden Corporation were not subject to the sales or use tax, but that the penalties contested were properly assessed. Both parties perfected direct appeals to this

Court from that portion of the Chancellor's decree adverse to their respective contentions.

In 1969, plaintiff entered into a contract with Parsons-Jurden Corporation, as general contractor, to perform a multi-million dollar expansion of plaintiff's copper processing plant in Copperhill, Tennessee. The clause in the contract containing the general description of the work provided, in part, that:

"The work . . . shall consist of the engineering, procurement, construction, management and start-up assistance and all other associated services necessary for the expansion of owner's existing facilities . . . ."

All of the on-site construction work and installation of industrial machinery was subcontracted by Parsons-Jurden Corporation to the Ralph M. Parsons Company. Parsons-Jurden retained the engineering, design, procurement, administrative and management services, and it is undisputed that all of these services were performed in its offices in New York, California and Germany.

Representatives of plaintiff met with officials of the Department of Revenue, Sales and Use Tax Division, to discuss the sales and use tax responsibilities of the owner, contractors and sub-contractors. As a result of the meeting, certain bank accounts were established for various specific purposes to assist both the taxpayer and the State in determining the correct tax. Insofar as this litigation is concerned, the significant understanding between the plaintiff and the Department of Revenue is confirmed in a letter dated March 5, 1970, from a staff attorney at the Department of Revenue to plaintiff's lawyer. The substance of the letter was that if all purchase orders issued by Parsons-Jurden Corporation for industrial machinery contained the legend, hereinafter set forth, Parsons-Jurden Corporation could place orders for the machinery and install it at the Copperhill location and no tax on the cost of installation would be due.

"It is understood and agreed that this order is entered into by Parsons-Jurden Corporation ("Company") for and on behalf of Cities Service Company ("Owner"); that title to all machinery, equipment or supplies furnished hereunder by the Vendor shall pass directly from the Vendor to the Owner; that Company will make payment out of a special account established by Owner for this order; and this sale is one to Owner and Vendor shall look only to Owner for payment."

No contention is made by the Commissioner that this procedure was not followed to the letter with respect to every purchase involved in this litigation.

A vice-president of Parsons-Jurden Corporation testified with respect to the procedure followed in purchasing industrial machinery on behalf of plaintiff:

"A  Acting as agents for Cities Service in accordance with the statement that appears on the second page of this letter of March 5, 1970. We did go out for competitive bids, which were analyzed and eventually purchase recommendations were made to our client. The client would then either approve or change our recommendation and so advise us. We would then issue a purchase order to the successful vendor and request that he furnish the equipment in accordance with the purchase document. We as agent signed that document. We then, after the material was completed in the vendor's shops, it was shipped to the jobsite. Upon receipt of an invoice for that equipment from the vendor we had a special construction account in the name of Cities Service Company, and a check was drawn by us in the amount specified on the invoice. That check was delivered to the Cities Service Company, who signed the check. The check was a Cities Service check and we passed that check on to the vendor after signature by the client."

Later, he described design function with respect to the iron roasting plant, which

was typical of several units involved in the additions to the Copperhill complex.

"A The copper roasting plant is made up of a substantial amount of equipment. When we set out with a flow sheet we prepare the equipment lists. We as an engineering firm know what we're looking for so we prepare specifications; however, we must go to additional people, such as vendors of equipment, with our specifications, from which they then manufacture a component of the plant. The information we give these people and they are specialists, let's take the case of the iron roaster, they are specialists in design of the iron roaster, so they design and fabricate it and ship it, say to the jobsite. Now in the case of an iron roaster, in this particular plant these roasters are approximately 40 feet in diameter and some 75 or 80 feet high, so they can't be shipped as one piece. They are fabricated and assembled in sections and we depend—in the iron roasting plant we have purchase orders for the roasting plant and we have purchase orders for the waste heat boilers, we have purchase orders for the gas, for the separation equipment, and pumps, various things that are associated with the complete plant. We do the conception of it and we depend upon the vendors to furnish the detail design for each piece that goes into that."

The witness testified that Parsons-Jurden Corporation performed no installation, construction or fabricating work, having no facilities or personnel to do so.

Plaintiff obtained an authorization to purchase industrial machinery and a use tax of one (1%) percent was paid on the sales price shown on all invoices of the vendors.

Prior to May 6, 1971, T.C.A. § 67–3002(c)4(6) provided as follows:

"4. 'Retail sale,' 'sale at retail,' and 'retail sales price' shall include the following services:

.    .    .    .    .    .

(6) The installing of tangible personal property as an incident to the sale thereof, where a charge is made for such installation."

Effective May 6, 1971, subsection (6) of T.C.A. § 67–3002(c)4(6) was amended to provide as follows:

"(6) The installing of tangible personal property which remains tangible personal property after installation where a charge is made for such installation whether or not such installation is made as an incident to the sale thereof and whether or not any tangible personal property is transferred in conjunction with such installation service."

Beginning in June, 1972, an initial audit was made of the plaintiff's books and records as a result of which a deficiency was assessed in the sum of $521,422, tax, penalty and interest. This deficiency included tax upon the engineering, design, procurement and administrative services of Parsons-Jurden Corporation rendered subsequent to May 6, 1971, and other items.

Following the initial audit report, upon which the assessment of $521,422 was made, an additional audit was conducted wherein the out-of-state engineering, design, procurement and administrative services of Parsons-Jurden that occurred prior to May 6, 1971, were subjected to taxation. That audit resulted in the imposition of tax, penalties and interest in the sum of $135,365.

By written stipulation signed by the parties and filed in the cause, it was agreed, among other things that the activities of Parsons-Jurden Corporation at its out-of-state offices, (1) did not constitute the "installing of personnel property" within the meaning of T.C.A. § 67–3002(c)4(6); (2) did not constitute "taxable installation labor" within the meaning of T.C.A. § 67–3002(n); and (3) did not constitute the "manufacturing producing, compounding or severing from the earth" of tangible personal property to be erected or applied, within the meaning of T.C.A. § 67–3004.

Further, it was stipulated that at a meeting of plaintiff's and defendant's representatives in August, 1972, defendant informed plaintiff that it had included Parsons-Jurden's out-of-state activities subsequent to May 6, 1971, in the deficiency assessment of $521,422, and that a supplemental audit would be conducted for the purpose of subjecting to taxation the cost of Parsons-Jurden's services incurred prior to May 6, 1971, ". . . on the theory that said costs were part of the cost of the personal property purchased by plaintiff."

## I.

The supplemental audit was made resulting in an additional assessment of $135,365 in taxes, penalty and interest, the recovery of which plaintiff seeks in this suit.

At the time defendant filed his answer in the Chancery Court, the Services of Parsons—Jurden were said to be taxable because they ". . . could be properly classified as fabrication charges or other costs adding value to the property on the books and records of plaintiff." Defendant's two (2) assignments of error are as follows:

"1. The Chancellor erred in determining that the engineering and design work of Parsons-Jurden Corporation could not be incorporated in the sales price of the industrial machinery, even though the ideas, genius and skill of Parsons-Jurden Corporation may have been incorporated in the end product.

2. The Chancellor erred in failing to distinguish between the 'industrial machinery' which was designed and engineered by Parsons-Jurden Corporation and the individual component machines which made up the industrial machinery, with the result that the design and engineering work done by Parsons-Jurden Corporation in connection with the fabrication of industrial machinery was excluded from the sales and use tax base for the sale or use of industrial machin-

ery, contrary to the Tennessee sales and use tax statutes."

The argument in support of the assignments of error is, in substance, that Parsons-Jurden engineering and design skill has transformed the many units of industrial machinery purchased from third party vendors, into several industrial complexes or units, each performing a particular function in the overall Copperhill operation; that these massive collections of industrial machinery which may be identified as an ore crushing plant, a pelletizing plant, etc. is the *basic unit* for sales tax purposes and that plaintiff's tax must be measured by the costs of the individual items of machinery plus the out-of-state charges for engineering and design performed by Parsons-Jurden Corporation, because, in the end, its skills produced an operating facility that extracts metals from ores.

■ In the jungle of verbiage that characterizes sales and use tax statutes it must not be forgotten that the privilege taxed is that of selling at retail tangible personal property in this state or the use or consumption, in this state, of any item or article of tangible personal property as defined in Chapter 30, Title 67 of the Code.

A "retail sale" includes only six categories of services expressly listed in T.C.A. § 67–3002(c)4, subsections one through six.

Defendant has stipulated that the services of Parsons-Jurden Corporation did not constitute the installing of personal property within the meaning of T.C.A. § 67–3002(c)4(6), and the other five categories of services declared to constitute retail sales are wholly foreign to the character of services involved in this litigation.

■ If Parsons-Jurden Corporation was the seller of the industrial machinery manufactured and sold by Westinghouse, Allis-Chalmers, and other vendors, we would be confronted with the mixed sale of tangible personal property and the performance of services, a situation that has spawned much litigation with widely varying results. See *Goodyear Aircraft Corp. v. Arizona State*

*Tax Com'n.,* 1 Ariz.App. 302, 402 P.2d 423 (1965) and *State of Alabama v. Natco Corporation,* 265 Ala. 184, 90 So.2d 385 (1956). Instead, we have in this case sales of tangible personal property to plaintiff by sellers who rendered no services and, as an entirely separate transaction, the rendering of services to plaintiff by a non-vendor.

■ Before this Court, the only statutory provision relied upon by defendant is the definition of "sales price" found in T.C.A. § 67–3002(d), providing in part that:

"(d) 'Sales price' means the total amount for which tangible personal property is sold, including any services that are a part of the sale, valued in money, whether paid in money or otherwise, and includes any amount for which credit is given to the purchaser by the seller, without any deduction therefrom on account of the cost of the property sold, the cost of materials used, labor or service costs, losses, or any other expense whatsoever . . .."

In our opinion, the services included in the above definition are limited to services rendered by the seller, as a part of the sale to the purchaser. They do not embrace services rendered by a third party to the sale.

Defendant seeks support of his theory in the case of *Crescent Amusement Company v. Carson,* 187 Tenn. 112, 213 S.W.2d 27 (1948). In *Crescent Amusement,* the taxpayers were operators of moving picture theaters who rented from a producer, film prints to exhibit for a definite time and a specified number of shows. The issue was whether such transaction was a rental of tangible personal property within the meaning of the sales tax law; and, if so, whether the tax was to be measured by the amount of the rental paid to the producer or by the cost of the physical material in the film print.

The taxpayer's insistence that the privilege of exhibiting a copyrighted film production was the exercise of an intangible property right was rejected.

In passing on the issue of the measure of the tax, the Court made the following observations:

"There is scarcely to be found any article susceptible to sale or rent that is not the result of an idea, genius, skill and labor applied to a physical substance. A loaf of bread is the result of the skill and labor of the cook who mixed the physical ingredients and applied heat at the temperature and consistency her judgment dictated. A radio is the result of the thought of a genius, or several such persons, combined with the skill and labor of trained technicians applied to a tangible mass of substance. An automobile is the result of all these elements, and of patents, etc.; and so on, *ad infinitum.* If these elements should be separated from the finished product and the sales tax applied only to the cost of the raw material, the sales tax act would, for all practical purposes, be entirely destroyed. The material used in the making of a phonograph record probably costs only a few cents. The voice of a Caruso recorded thereon makes it sell for perhaps a dollar. To measure the sales tax only by the value of the physical material in this phonograph record is to apply an impossible formula." 187 Tenn. at 116, 117, 213 S.W.2d at 29.

It is no doubt true that every piece of industrial machinery purchased by plaintiff in this case had incorporated therein the ideas, skill and labor and perhaps genius of one or more persons, but there is no showing in this record that any piece of industrial machinery purchased by plaintiff was the product of raw materials plus the idea, genius, skill and labor of Parsons-Jurden Corporation.

The engineering and design skills, patents, etc. of persons in the employ or under the egis of manufacturers of industrial machinery such as Westinghouse and Allis-Chalmers were applied directly to a tangible mass of substance to produce the items of machinery purchased by plaintiff in this

suit. The value of those skills was undoubtedly reflected in the invoice prices paid said manufacturers and the tax thereon has been paid.

The services rendered by Parsons-Jurden were not rendered in the fabrication or processing of any of the units of industrial machinery taxable in this case, and it is so stipulated by defendant.

## II.

Plaintiff insists that the equities demand remission of penalties assessed in the total sum of $89,131.

First, with respect to a penalty of $50,741 attributable to the tax on job site installation labor incurred subsequent to May 6, 1971, plaintiff contends that its failure to pay the tax timely is attributable to reliance upon the express advice of the Department of Revenue and the confusing and misleading nature of the law.

The advice referred to was contained in the letter of March 5, 1970, to the effect that no tax would be due on installation costs, if the procedure described therein was followed. Implicit in plaintiff's position is the lack of actual knowledge that the Legislature amended T.C.A. § 67–3002(c)4(6) expanding the tax liability for installation costs effective May 6, 1971, creating a liability for such costs that did not exist under the prior law, as confirmed by the letter of March 5, 1970.

Next, plaintiff directs our attention to a letter dated January 13, 1972, from W. J. Owens, Director of the Sales and Use Tax Division of the Department of Revenue to plaintiff advising that said code section had been amended and the express language of the new subsection was quoted. The letter concluded with the statement that the amendment was brought to the attention of the plaintiff, ". . . on the chance that your tax advisors may have overlooked this important change in the law as it applies to your undertaking at Copperhill."

Plaintiff finds fault with Mr. Owens' letter in that it is said he omitted the one sentence that would have clarified the situation; to wit, that the prior arrangement approved in the letter of March 5, 1970, no longer relieved Cities Service from the obligation to pay taxes on the installation charges. This omission is said to have unintentionally misled taxpayer in a manner comparable to the case of *Tidwell v. Goodyear Tire & Rubber Co.,* 520 S.W.2d 721 (Tenn.1975), wherein this Court granted equitable relief from a sales and use tax penalty.

■ It is clear that in this case plaintiff's failure to keep abreast of the Tennessee Sales and Use Tax Law was the cause of the late payment of use taxes on installation costs. That failure on the part of the plaintiff cannot be laid at the door of the Department of Revenue based on either or both of the two letters. The March, 1970 letter was based on the law as it existed at that time and no principle of law or equity justifies reliance upon its efficacy after a change in that law. The Legislature's law making power and taxing authority cannot be thwarted in that manner.

■ This Court held in *Swartz v. Atkins,* 204 Tenn. 23, 315 S.W.2d 393 (1958) that it was the intention of the Legislature in assessing the five (5%) percent penalty to make it apply in any instance where the taxpayer had failed to make his return and make the payments on time. The issue in the case is the five (5%) percent penalty not the fifty (50%) percent penalty. The good faith of the taxpayer is not in question and we agree with plaintiff's assertion that there is no evidence whatever of bad faith on its part. However, where it is shown that payment of the tax was not made within the time required by the statute the five (5%) percent penalty must be assessed. The equitable relief of remission of the penalty can only be granted upon a showing of good and reasonable cause falling within the four (4) guidelines approved in *Benson v. United States Steel Corp.,* 225 Tenn. 164,

465 S.W.2d 124 (1971), and *Tidwell v. Goodyear Tire & Rubber Co., supra.*

In our opinion the factual situation here is analogous to that in *Swartz v. Atkins, supra,* and must be denied for the same reasons stated by Mr. Justice Burnett therein.

"In the case before us what are the equities? The only equities are the want of knowledge or acquaintance with the laws of this State insofar as they are applied to the duty of this taxpayer to make a return and pay the taxes. This taxpayer was familiar with the sales tax law and he avers that he had been paying sales taxes on time. By reading a little further or upon consulting counsel it would have been found by him, with the greatest of ease, that the taxes were due when he placed his machines on location as he did herein.

If the complaint or reason advanced by the taxpayer of ignorance would be sufficient to excuse the payment of this tax demanded then every taxpayer could very easily use the same excuse and honestly do so. All he would have to do would be to fail to read the papers of the Acts or to consult his counsel or to talk to individuals then he could say that he was honestly unaware that there was a tax on this or that act. The law does not recognize such an excuse as an equity in favor of relieving a taxpayer of his obligation when by the slightest investigation or inquiry these things, that is taxes, could have been determined." 204 Tenn. at 28, 315 S.W.2d at 395.

Plaintiff contends that the balance of the penalty in the sum of $38,380 was attributable to the failure of the Parsons Companies to follow written instructions of plaintiff with respect to accounting procedures. In essence, plaintiff asserts that the Parsons Companies failed to timely report the purchase and accrual of tax liability on certain items of tangible personal property, and as a result, through no fault of its own, the taxes thereon were paid after the due date.

Plaintiff contends that the evidence clearly shows that Parsons-Jurden and the Ralph M. Parsons Company were responsible for providing plaintiff with a monthly report showing the items of tangible personal property purchased during the month, and the use taxes due thereon; and that plaintiff used this report to prepare its monthly sales and use tax report to the Department of Revenue. Plaintiff further insists that it had no reason to doubt or question the accuracy of the monthly reports of these contractors. Further plaintiff points to the fact that it went to great length to establish and follow proper procedures for the payment of sales and use taxes to the State of Tennessee.

It is urged that these circumstances justify relief under the following guideline, one of four, approved by *Benson v. U. S. Steel Corp., supra, Tidwell v. Goodyear Tire & Rubber Co., supra,* the deficiency resulted from a reliance by the taxpayer upon factual misrepresentation made by persons with whom he dealt in the course of his business, the taxpayer having no reason to doubt or question such misrepresentation.

We do not agree that the failure of plaintiff's contractors to fully or timely include in its monthly reports every item of tangible personal property upon which tax liability had accrued, falls within the category of factual misrepresentation. There is certainly no evidence in the record that the parties with whom plaintiff contracted purposely, fraudulently, or even negligently failed in the respect stated. The testimony in the record is simply to the effect that it was not the fault of the plaintiff. Further, Parsons-Jurden and the Ralph M. Parsons Company were acting as agents of the plaintiff in purchasing the tangible personal property involved and in preparing the monthly report of said purchases to plaintiff. We think this issue is comparable to the case of *Combustion Engineering Company v. MacFarland,* 209 Tenn. 75, 349 S.W.2d 138 (1961) wherein errors and oversights of various record keepers and ac-

countants of the taxpayer, and failures and omissions of an independent company employed to install an IBM machine were responsible for taxpayers failure to pay sales and use taxes when due.

We have carefully examined all of the authorities relied upon by plaintiff, especially *Tidwell v. Goodyear Tire & Rubber Co., supra,* and we are unable to find any ground upon which relief may be granted in this case.

The decree of the Chancellor is affirmed. Costs of this appeal are divided equally between the parties.

COOPER, HENRY and HARBISON, JJ., and INMAN, Special Justice, concur.